UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RONALD WARD

                              Plaintiff,

v.

NANCY A. BERRYHILL,

                             Defendant.

Case No.: 17-CV-2371-W(WVG)

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**[Doc. Nos. 14, 15.]**

      This is an action for judicial review of a decision by the Acting Commissioner of Social Security, Nancy A. Berryhill ("the Commissioner," or "Defendant"), denying Plaintiff Ronald Ward supplemental security income ("SSI") benefits under Title XVI of the Social Security Act. The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation. For the reasons stated below, the Court RECCOMNENDS that Plaintiff's motion for summary judgment be GRANTED-IN-PART and DENIED-IN-PART, Defendant's cross-motion for summary judgment be GRANTED-IN-PART and DENIED-IN-PART, and the matter be remanded for further proceedings.

/ / /

/ / /

# I. OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Social Security Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A. The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically-determinable impairment[1] that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both of these requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving that he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds that a claimant is disabled or not disabled at any step in this process,

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

If the ALJ does not deem a claimant disabled—but before formally proceeding to step four—the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting."

*Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must assess relevant medical and other evidence, as well as consider all of the claimant's impairments, including impairments categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the ability to perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to

seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report, and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either make a decision or refer the matter to another ALJ. *Id.* § 404.983.

## II.  BACKGROUND

### A.  Administrative Proceedings

Plaintiff is a 69-year-old veteran who, among many other ailments, reportedly suffers chronic back pain that "is more likely than not" related to his fall from a two-ton military truck in or around 1968. (AR 1924.) In July 2009, Plaintiff protectively filed an application for SSI, alleging disability as of July 31, 2007. (AR 69-70.) In December 2009, the SSA denied this initial application, (AR 76-80.), and the SSA denied his application for reconsideration in March 2010, (AR 83-88). On March 29, 2010, Plaintiff requested a hearing before an ALJ, which occurred on July 15, 2011. (AR 89, 37.) In July 2011, the ALJ issued a written decision, denying Plaintiff's claims. (AR 14-68.) The Appeals

Council denied Plaintiff's Request for Review of that decision in July 2013. (AR 1-4.) In September 2013, Plaintiff filed a Complaint for Review of the Final Decision of the Commissioner of Social Security in United States District Court. (AR 794-803.) On June 30, 2014, the undersigned Magistrate Judge issued a Report and Recommendation ("R&R") recommending that the Court grant Plaintiff's motion for summary judgment, deny Defendant's motion for summary judgment, and remand the case to the ALJ for further proceedings. (AR 811-53.) After review, the R&R was adopted in its entirety, and the case was remanded for further proceedings. (AR 810-11.)

On February 17, 2016, the ALJ held a second hearing to review Plaintiff's claim. (AR 715-42.) Plaintiff and a vocational expert ("VE") testified at the hearing. (*Id.*) The ALJ issued his written decision on July 19, 2016. (AR 688-710.)

At step one of the sequential evaluation process described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since July 1, 2011, the amended onset date. (AR 693, 718, 1055.) At step two, the ALJ found Plaintiff had severe impairments of (1) arthritis of the back, knee, hip and pelvis, and (2) hypertension that caused significant limitation in the Plaintiff's ability to perform basic work activities. (AR 693.) At step three, the ALJ found that the Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 697.)

Between steps three and four, in his RFC assessment, the ALJ found Plaintiff could perform light work, except that he was limited to lifting, carrying, pushing or pulling twenty pounds occasionally and ten pounds frequently; sitting or standing and/or walking for six hours in an eight-hour workday; performing simple repetitive, and detailed tasks; and had no difficultly in his interactions with the public, supervisors, or co-workers. (*Id.*)

At step four, the ALJ found Plaintiff was able to perform his past relevant work as an "employment interviewer" or "fund raiser II." (AR 702.) The VE classified Plaintiff's past relevant work as an employment interviewer as a skilled, sedentary level of work and as a fund raiser II as an unskilled, light level of work activity. (*Id.*) The ALJ concluded that

Plaintiff could perform these two past relevant occupations. (*Id.*) Accordingly, the ALJ found that Plaintiff was not disabled from July 1, 2011 through the date of the decision. (*Id.*)

Plaintiff thereafter requested a review of the ALJ's decision (AR 8-10), but the Appeals Council denied his request for review (AR 1-7). The ALJ's decision thereafter became the SSA's final and definitive determination in Plaintiff's case. 42 U.S.C. § 405(g). Plaintiff then commenced the instant action for judicial review. (Doc. No. 1.) Plaintiff thereafter filed a motion for summary judgment ("MSJ") (Doc. No. 14), and Defendant filed a cross-motion for summary judgment ("Cross-MSJ") and opposition to Plaintiff's MSJ (Doc. No. 16). Plaintiff filed an opposition to Defendant's Cross-MSJ. (Doc. No. 17.)

**B.    Medical Records Submitted to the ALJ for Review**

On October 17, 2009, internist Noli A. Cava, M.D., evaluated Plaintiff. Her evaluation shows that Plaintiff's chief complaints were pain in the lower back, hips, and knees. (AR 346.) Additionally, Dr. Cava noted that Plaintiff had a history of (1) hypertension, (2) childhood asthma, (3) degenerative joint disease of his lower back, and (4) depression. (*Id.*) Dr. Cava indicated that Plaintiff could sit, stand, and walk for six hours in an eight-hour workday; he could lift ten pounds frequently and 20 pounds occasionally. (AR 348.) Finally, Dr. Cava noted that Plaintiff did not have any trouble sitting or standing and was "alert and oriented." (AR 347.)

On November 3, 2009, Dr. Haaland examined Plaintiff and found he had a normal physical examination, excellent walking tolerance, and normal neuro-musculo-skeletal examination. (AR 349-52.)

On November 30, 2009, state agency physician Dr. Engelhorn conducted a psychiatric evaluation of Plaintiff. (AR 353-56.) He observed Plaintiff was alert and cooperative. (AR 355.) He noted that although Plaintiff has struggled with depression, he only began to seek treatment two years prior. (AR 356.) Dr. Englehorn noted that Plaintiff could perform simple, repetitive tasks and could also perform complex and detailed work. (*Id.*)

On March 3, 2010, Dr. B. Smith, a state agency physician, completed a mental RFC assessment after determining that Plaintiff had an affective disorder in the form of "Mood Disorder, NOS." (AR 461-71.) However, Dr. Smith determined that Plaintiff had no marked functional limitations caused by this disorder. (AR 466.) Dr. Smith also found that Plaintiff had no limitations in daily living; had moderate difficulty in maintaining social functioning; had mild difficulty maintaining concentration, persistence, or pace; and experienced no episodes of decompensation. (*Id.*) In his RFC assessment, Dr. Smith determined that Plaintiff had moderate limitations in his ability to understand and remember detailed instructions; accept instructions and respond appropriately to criticism from supervisors; and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 469-70.) Dr. Smith found marked limitations only in the Plaintiff's ability to interact with the general public. (AR 470.) In all other categories, Plaintiff was not significantly limited. (AR 469-70.) Dr. Smith opined that Plaintiff could perform unskilled, non-detailed tasks in a nonpublic setting. (AR 468.)

Dr. Frank Bradford completed a Mental Residual Functional Capacity questionnaire on December 30, 2009 and diagnosed Plaintiff with major depressive disorder. (AR 585-90.) He reported that Plaintiff had a Global Assessment of Functioning or "GAF" score of 55.[2] (*Id.*) Dr. Bradford indicated that Plaintiff was unable to meet competitive standards in his ability to remember work-related procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for a two hour segment, maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with others, work in close proximity to others, make simple work related decisions, complete a normal work day or workweek without

---

[2] A GAF score of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). Am. Psychiatry Assoc., *Diagnostic and Statistical Manual of Mental Health Disorders*, Fourth Ed. Text Revision (DSM-IV-TR), 34 (2000).

interruption from psychologically based symptoms, and deal with normal work stress. (AR 587.) Dr. Bradford indicated that Plaintiff's impairments or treatments would cause him to be absent from work more than four days per month. (AR 589.)

Psychologist Archana Jajodia, Ph.D., also completed a Mental Residual Functional Capacity questionnaire on December 30, 2009, and reported seeing Plaintiff twice prior to completing the questionnaire. (AR 592-97.) Dr. Jajodia diagnosed Plaintiff with major depressive disorder with recurrent, severe with psychotic features; alcohol dependence; and cocaine dependence. (*Id.*) Like Dr. Bradford, Dr. Jajodia found Plaintiff had a GAF score of 55. (*Id.*) Dr. Jajodia indicated that Plaintiff was unable to meet competitive standards in his ability to maintain attention, work in coordination with—or in proximity to—others, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychological symptoms, perform at a consistent pace, deal with normal work stress, and maintain socially appropriate behavior. (AR 594.) Dr. Jajodia also indicated that Plaintiff's impairments would cause him to miss work more than four days per month. (AR 596.)

On November 23, 2011, Dr. Eric Frey completed a Physical Residual Functional Capacity Questionnaire after examining Plaintiff. (AR 1126-30.) Prior to completing this RFC, Dr. Frey ordered an MRI of Plaintiff. (AR 1834-36.) The MRI showed "mild degenerative changes in the lumbar spine . . . causing mild bilateral neural foramina narrowing . . . and moderate left neural foramina narrowing." (AR 1836.) Dr. Frey opined Plaintiff suffered from lumbago, depression, and lower back pain. (AR 1126.) He noted that these conditions caused frequent interference with Plaintiff's attention and concentration abilities. (AR 1127.) He also noted that Plaintiff could walk four blocks without rest, could stand/walk for less than two hours in an eight-hour workday, and could sit for four hours in an eight-hour workday. (AR 1128.) Plaintiff would also need a job which would permit shifting positions at will from sitting, standing, or walking positions. (*Id.*) Dr. Frey opined that Plaintiff would need to take four fifteen-minute unscheduled breaks during an eight-hour workday. (AR 1129.) He noted that Plaintiff could

occasionally lift less than ten pounds but never lift ten, twenty, or fifty pounds. (*Id.*) Finally, he opined that Plaintiff's impairments would cause him to be absent from work less than once a month. (AR 1130.)

On March 6, 2012, Dr. Kristin Beizai completed a Mental Impairment Questionnaire after examining Plaintiff for the second time. (AR 1120-23.) She documented Plaintiff's symptoms as: sleep disturbance, mood disturbance, emotional lability, decreased energy, difficulty thinking or concentrating, hostility, and irritability. (AR 1120-21.) Her examination found that Plaintiff was depressed, irritable, and had poor sleep and impaired concentration. (AR 1121.) Dr. Beizai also noted that Plaintiff's condition was exacerbated by his chronic pain. (AR 1122.) In assessing whether Plaintiff's impairments caused him to be absent from work, Dr. Beizai noted that he would be absent more than three times per month, but noted that this would be "more related to pain." (*Id.*) Finally, she noted that Plaintiff would have difficulty working a regular job on a sustained basis, again "mainly related to pain." (AR 1123.)

On May 8, 2012, Dr. Beizai followed up with Plaintiff and noted that he "continue[d] to report feeling down . . . sleep erratic depends on pain level . . . sleeping 3-4 hours a night." (AR 2316.) Also, Plaintiff "continue[d] with irritability and angry outbursts, 'most days.'" (*Id.*) On October 3, 2012, Dr. Beizai evaluated Plaintiff again. (AR 2268.) Her notes indicate Plaintiff "continue[d] with intermittent irritable angry verbal outbursts-about [twice] a month." (*Id.*) In total, Dr. Beizai examined Plaintiff on 11 separate occasions. (AR 2356 (Jan. 24, 2012); 2341 (March 6, 2012); 2315 (May 8, 2012); 2266 (October 3, 2012); 2215 (January 8, 2013); 1155 (April 5, 2013); 1145 (July 8, 2013); 1978 (October 8, 2013); 1845 (January 10, 2014); 1785 (April 14, 2014); and 1755 (June 9, 2014).) Dr. Beizai then completed a second assessment on August 14, 2014, in which she found moderate limitations in Plaintiff's abilities to understand, remember, and carry out detailed instructions; moderate limitations in his ability to make judgments on simple work-related decisions; and a marked limitation in his ability to make judgments in complex work-related decisions. (AR 1246-47.)

On October 2, 2013, state agency physician Dr. George Spellman evaluated Plaintiff. (AR 773-76.) Dr. Spellman noted that Plaintiff's maximum RFC was consistent with the ALJ's previous determination at the July, 29, 2011 hearing, and he could perform a full range of light work. (*Id.*) He noted Plaintiff could occasionally lift twenty pounds, frequently lift 10 pounds, stand or walk with normal breaks for about six hours in a normal eight hour workday, sit for six hours during an eight hour workday, and push or pull unlimited amounts. (AR 779.) Dr. Spellman opined that Plaintiff's impairments would not preclude him from performing his past relevant work as an employment interviewer. (AR 780.)

On October 10, 2013, state agency physician Dr. K. Loomis examined Plaintiff and found that he would experience mild restriction of daily living; mild difficulty in maintaining social functioning; mild difficulty maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (AR 777.) At the reconsideration level, on January 10, 2014, state agency Dr. R. Paxton confirmed Dr. Loomis's findings. (AR 783-92.)

On November 20, 2014, chiropractor Joe Verna completed a Functional Capacity Evaluation. (AR 1233-43.) He noted that Plaintiff was unable to demonstrate any lifting, carrying, or climbing abilities. (AR 1242.) He concluded that Plaintiff was below sedentary to unemployable. (*Id.*)

On March 1, 2016, clinical psychologist Neal Doran, Ph.D., completed a Statement of Ability to Do Work Related Activities (Mental) evaluation. (AR 2124-26.) He opined that Plaintiff had no impairment in his ability to understand and remember short and simple instructions, and he could carry out short, simple instructions. (AR 2124.) He opined that Plaintiff had slight impairment in his ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; and make judgments on complex work-related decisions. (*Id.*) The clinical findings that supported these finding included chronic, intermittent bouts of anxiety and depressed mood, poor sleep, and poor hygiene. (*Id.*)

Dr. Doran also noted that Plaintiff had no restrictions on his ability to maintain attendance and punctuality during a workday and workweek, and he could sustain an ordinary routine without special supervision. (AR 2125.) Plaintiff had slight restriction on his ability to perform at a consistent pace without more than regular breaks in a workday, he could interact appropriately with the public, and he could respond appropriately to changes in a routine work setting. (*Id.*) Finally, Plaintiff was moderately restricted in his ability to interact appropriately with supervisors and coworkers. (*Id.*) Dr. Doran attributed these restrictions to Plaintiff's history of conflict with healthcare providers and hospital staff, likely as a result of symptoms of chronic pain, anxiety, and depression. (*Id.*)

## C. Relevant Portions of the ALJ's Decision

This appeal focuses on the ALJ's treatment of the opinions of Dr. Frey and Dr. Beizai. Accordingly, the following are the relevant excerpts from the ALJ's decision that address these doctor's opinions.[3] The first section relates to Dr. Beizai's opinions, and the second relates to Dr. Frey.

> **3.    The claimant has the following severe impairments: arthritis of the back, knee, hip and pelvis and hypertension (20 CFR 404.1520(c) and 416.920(c)).**
>
> . . . .
>
> The claimant has also alleged disability due to a depressive disorder. On February 6, 2012, the claimant underwent an initial psychological consultation at the Veteran's Administration Medical Center, having been referred by psychiatrist, Kristin Beizai, M.D. It is noted that at this time the claimant denied any current symptoms of depression, but did report struggling with depression in the past. During the evaluation it was reported that the claimant was alert and oriented in three spheres, his thought process was linear and goal directed. He described his mood as "doing well," and his affect was wide-ranging and appropriate to content. His rapport was relatively easy to establish, speech was of normal rate and rhythm and there was no evidence of auditory or visual hallucinations. The claimant was diagnosed with a

---

[3] These excerpts are reproduced verbatim, with punctuation, formatting, and sentence structures as originally written.

depressive disorder, not otherwise specified and alcohol dependence and there was a discussion of anger management therapy (Exhibit 26F).

Psychiatrist, Kristin Beizai, M.D., completed a mental impairment questionnaire on March 6, 2012. It is noted that the doctor reported that this date was only the second time she saw the claimant, having initially seen him on January 24, 2012. However, based on the two appointments, she diagnosed him with a major depressive disorder and alcohol dependence. Signs and symptoms of his impairment included a sleep disturbance, a mood disturbance, emotional lability, decreased energy, difficulty concentrating and irritability. His current medications included 40mg Prozac and 25mg Trazadone, which caused no side effects for the claimant. Dr. Beizai opined the claimant could be anticipated to be absent from work more than three times per month as a result of his impairment or for treatment; however, the doctor stated that these absences were more related to his pain condition and not due to any mental impairment. Additionally, she reported that he would have difficulty working at a regular job on a sustained basis; again, mainly related to his pain condition and not due to any mental limitation. It was opined that the claimant would have no restriction in activities of daily living; moderate difficulties maintaining social functioning; he would often have deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner and he would have experienced three or more repeated episodes of decompensation or deterioration of an extended duration (Exhibit 20F).

Dr. Beizai completed an updated medical source statement of ability to do work-related activities (mental) on August 14, 2014. It is noted in this report the only area she opined that the claimant had marked limitation was in his ability to make judgments on complex work-related decisions. All other areas of functioning are opined to be only moderate or even slight (Exhibit 23F).

. . . .

Follow-up notes by Dr. Beizai, dated June 2, 2015, report the claimant stating that he would never harm himself and there is no evidence of psychosis. The mental status examination revealed the claimant to be neatly groomed, calm and cooperative with no psychomotor agitation/psychomotor retardation, speech was of regular rate and rhythm, his mood was down on this day and his affect dysphoric. However, his thought process was congruent and linear and thought content included no psychosis, no suicidal ideation or homicidal ideation, no delusions and insight and judgment were fair (Exhibit 24F).

17-CV-2371-W(WVG)

The undersigned Administrative Law Judge acknowledges the opinion expressed by Dr. Beizai in the March 6, 2012, mental questionnaire. However, it is noted that the claimant only saw Dr. Beizai on two occasions, this does not represent a longitudinal history of treatment or examining relationship (20 CFR 404.1527(d)(2) and 416.927(d)(2)). It is also noted that most of the limitations assessed were reported to be the result of the claimant's pain condition and not due to any mental impairment. Accordingly, the opinion of Dr. Beizai is granted little weight.

. . . .

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Light work is defined as lifting, carrying, pushing or pulling twenty pounds occasionally and ten pounds frequently and sitting or standing and/or walking for six hours in an eight-hour workday. Additionally, the claimant could perform simple repetitive and detailed tasks and he would have no difficulty in his interactions with the public, supervisors or co-workers.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 96-4p. The undersigned has also considered opinion evidence in accordance with the requirements of 30 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, or functionally limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose

whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant's treating internist, Eric Frey, M.D., completed a physical residual functional capacity questionnaire on November 3, 2011. The doctor reported that he sees the claimant every 3-6 months and that he has been diagnosed with lumbago and depression. His symptoms included chronic back pain with radiation to both legs. Objective signs included impaired walking and a bilateral straight leg-raise test positive at 10 degrees. Treatment has included physical therapy, non-steroidal anti-inflammatory drugs (NSAIDs), a TENS unit and antidepressants. The doctor stated that the claimant's impairment was reasonably consistent with the symptoms and functional limitations described in this evaluation, and . . . he would frequently experience pain or other symptoms severe enough to interfere with attention and concentration and he would have a moderate limitation in his ability to deal with work stress. Dr. Frey opined that the claimant could walk four city blocks without rest and that he could sit for about four hours in an eight-hour workday and stand and/or walk for less than two hours in an eight-hour workday; however, he would not require periods of walking around during an eight-hour workday. He would need a job that permitted shifting positions at will from sitting, standing or walking. Additionally, he would sometimes need to take unscheduled breaks during an eight-hour workday; however, those breaks would only need to be every four hours for approximately 15 minutes each time. The claimant could occasionally lift and carry up to ten pounds, but never more and he would have no limitation in doing any repetitive reaching, handling or fingering. While the claimant would likely experience "good days," and "bad days," it was opined that on average he could anticipate[] to be absent from work less than one day per month as a result of his impairment or for treatment (Exhibit 21F).

The undersigned acknowledges the opinions expressed by Dr. Frey in his November 23, 2011, physical residual functional capacity questionnaire. It is noted that he reported some pretty significant limitations for the claimant, yet the doctor acknowledges that he only sees the claimant every 3 to 6 months; this is not consistent with someone experiencing a disabling level of pain. In addition, the doctor only diagnosed the claimant with lumbago, not something more severe, such as degenerative disc disease or herniations. Furthermore, the undersigned notes that Dr. Frey opined that the claimant would only be

absent from work less than one day per month. Lastly, he reported that the claimant would only need to take unscheduled breaks every four hours and it would only have to have to last 15 minutes. This would fit within the typical two 15 minute breaks and one 30 minute lunch in a typical workday. Based on these inconsistencies within the report and with other evidence in the claimant's medical records, the undersigned grants minimal weight to the opinion expressed by Dr. Frey.

A magnetic resonance imaging (MRI) scan was taken of the claimant's lumbar spine on October 22, 2012, due to the provisional diagnosis of spinal stenosis. The scan revealed only mild degenerative changes in the lumbar spine, with minimal disc bulge at L3-4 causing mild bilateral neural foraminal narrowing . . . at L4-5 causing mild right and moderate left neural foraminal narrowing. It is noted that this scan was performed for the purposes of increasing the claimant's Veteran's rating (Exhibit 26F).

. . . .

The most recent medical records from Kaiser Permanente, from August 2015, include a list of 20 plus active problems for the claimant. However, the list most significantly includes continuous cannabis use and unspecified alcohol dependence with continuous drinking behavior. Additionally, it is noted that his major depressive disorder is reported as recurrent, severe with psychotic features (Exhibit 24F/page 81); however, just shortly before, on July 16, 2015, his mental status examination was reported as essentially normal with specific comment of no delusions or psychosis noted and no obsessions or compulsions (Exhibit 24F/pages 171-172). Additionally, it is significant that on July 15, 2015, the claimant was applying for the first time for depression as a service-connected condition and he commented to Dr. Wei, that he was upset with Dr. Beizai for not providing a letter stating that his depression was service connected (Exhibit 24F/pages 173-174). It was also reported that the claimant was classified as obese; however, on August 24, 2015, he admitted that he did not like to exercise and that he had no money to exercise. Additionally, the claimant acknowledges that his compliance with his CPAP equipment was poor and that he was only using it two of seven nights per week and only four hours per night (Exhibit 24F/pages 78-79).

The undersigned Administrative Law Judge noted that based on his review of the evidence and his observations of the claimant in the course of the hearing he has no difficulty with memory or concentration. He did not apply for any type of depression treatment until 2013, and the evidence of record

demonstrated certain[] medical improvement as noted in his last mental status examination of April 10, 2015. There is no indication of record that the claimant is unable to interact properly with co-workers, supervisor[s] and the public. The most significant rating of limitation was his treating psychiatrist is moderate, and that doctor's opinion was only that he could not engage in complex tasks. Therefore, the undersigned finds a residual functional capacity for light work and simple, repetitive and detailed tasks with no difficulty interacting with the public, supervisors or co-workers.

In determining the claimant's residual functional capacity, the undersigned has also considered the allegations of his symptoms and functional limitations as required by 20 CFR 404.1529(c), 416.929(c) and Social Security Ruling 96-4p and 16-3p.

However, to the extent that it is alleged that the claimant cannot perform work at the residual functional as recited above, the Administrative Law Judge finds those allegations are not totally consistent with the evidence for the following specific and legitimate reason.

**First**, when the claimant underwent the initial psychological consultation at the Veteran's Administration Medical Center, on February 6, 2012, the claimant denied any current symptoms of depression and he described his mood as "doing well," and his affect was reported to be wide-ranging and appropriate to content. **Second**, in the March 6, 2012, mental impairment questionnaire, psychiatrist, Dr. Beizai, reported that the claimant could be anticipated to be absent from work more than three times per month as a result of his impairment or for treatment; however, the doctor stated that these absences were more related to his pain condition and not due to any mental impairment. Therefore, the psychiatrist indicated that the claimant would not likely miss work due to any mental impairment.

**Third**, the claimant's treating internist, Dr. Frey completed a physical residual functional capacity questionnaire on November 23, 2011, in which he reported that he only sees the claimant every 3-6 months and that his back disorder has been diagnosed as lumbago. The diagnosis and the fact that Dr. Frey only sees the claimant every 3-6 months would not be consistent with someone experiencing a disabling level of back pain. **Fourth**, Dr. Frey reported that the claimant would sometimes need to take unscheduled breaks during an eight-hour workday; however, those breaks would only need to be every four hours for approximately 15 minutes each time. Accordingly, the claimant's necessary rest periods would fit into the typical workday that

included two 15-minute breaks and one 30-minute lunch period and he would not require any additional rest periods. **<u>Fifth</u>**, it was also opined by Dr. Frey, that on average the claimant could anticipate[] to be absent from work less than one day per month as a result of his impairment or for treatment. Again, this is not consistent with a disabling level of impairment. **<u>Sixth</u>**, the MRI scan taken of the claimant's lumbar spine on October 22, 2012, revealed only mild degenerative changes in the lumbar spine, with a minimal disc bulge at L3-4 causing mild bilateral neural foramina narrowing and the L4-5 causing mild right and moderate left neural foraminal narrowing. **<u>Seventh</u>**, treatment records from Kaiser Permanente from August 2015, note that claimant's major depressive disorder is reported as recurrent, severe with psychotic features; however, just shortly before, on July 16, 2015, his mental status examination was reported as essentially normal with specific comment of no delusions or psychosis noted and no obsessions or compulsions. Therefore, the doctor's diagnosis just weeks after the essentially mental examination, is not consistent with such a significant impairment.

**<u>Eighth</u>**, when discussing the claimant's impairments, no physician, neither any of claimant's treating physicians or a State Agency physician ever opined that listing level limitations were ever met or equaled. **<u>Ninth</u>**, the objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(AR 697-701 (emphasis and formatting in original).)

### III. STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a scintilla, but less than a preponderance. *Id.* Substantial evidence is evidence that a reasonable mind would consider adequate to support a conclusion. *Id.* The ALJ is responsible for determining credibility,

17-CV-2371-W(WVG)

resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV. DISCUSSION

Plaintiff challenges the ALJ's adverse decision on two grounds. First, he contends that the ALJ did not articulate specific and legitimate reasons for discounting Dr. Kristin Beizai's opinion, which if credited, would warrant a finding of disability. Second, Plaintiff contends that the ALJ did not articulate specific and legitimate reasons for discounting Dr. Eric Frey's opinion. This Court addresses the ALJ's treatment of each doctor's opinions in turn and finds that the ALJ erred in giving little weigh to Dr. Beizai's opinions. However, the ALJ did not err in assigning little weight to Dr. Frey's opinions because the ALJ provided at least one valid reason for doing so. The Court further finds that the error with respect to Dr. Beizai's opinion was not harmless and recommends remand for further proceedings.

## A. Legal Standard: An ALJ's Treatment of a Treating Physician's Opinion

The Ninth Circuit distinguishes "among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal quotations and citation omitted).

Under the so-called "treating physician rule,"[4] the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable

---

[4] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her. 20 C.F.R. § 416.902.[5] Treating physicians' opinions are generally accorded deference because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 416.927(c)(2).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (internal quotations and citation omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (same). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (same).

## B. The ALJ's Treatment of Dr. Beizai's Medical Opinion.

In his decision, the ALJ gave "little weight" to "the opinion expressed by Dr. Beizai in the March 6, 2012, mental questionnaire" for two reasons. First, the ALJ found that because Plaintiff "only saw Dr. Beizai on two occasions, this does not represent a longitudinal history of treatment or examining relationship . . . ." (AR 695.) Plaintiff challenges this reasoning and argues that although Dr. Beizai only saw him twice before

---

[5] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." 20 C.F.R. § 416.902.

17-CV-2371-W(WVG)

the March 6, 2012 mental impairment questionnaire, he had a longitudinal relationship with Dr. Beizai because she treated him every three months for two years after the March 2012 assessment and she was a part of the treatment team at the Veterans' Administration ("VA") treatment facility.

The ALJ's second reason for giving little wait to Dr. Beizai's March 6, 2012 opinion was "that most of the limitations assessed were reported to be the result of the claimant's pain condition and not due to any mental impairment." (*Id.*) Plaintiff challenges this reasoning, arguing that this is factually untrue because Dr. Beizai referred to clinical findings to support her diagnoses of major depressive disorder, which was only exacerbated by—not solely based on—his pain.

1. **Dr. Beizai Had a Longitudinal History of Treatment or Examining Relationship.**

Although it is true that Plaintiff visited Dr. Beizai twice before she completed her mental questionnaire on March 6, 2012, (AR 2341 (March 6, 2012), 2356 (Jan. 23, 2012)), the fact that a treating physician's opinions are based on a small number of evaluations does not necessarily lessen the weight of the treating physician's opinion if other circumstances are present. In *Ghokassian v. Shalala*, the Ninth Circuit sharply rebuked an ALJ's rejection of a treating physician's opinion where the physician had seen the claimant "twice within a 14-month period preceding the hearing," had seen no other physicians during that period, had been requested by the claimant, had prescribed drugs for the claimant, referred to the claimant as "my patient," and had the most extensive experience with the claimant. 41 F.3d 1300, 1303 (9th Cir. 1994). Based on these surrounding facts, the Ninth Circuit concluded that the physician was "without doubt" the claimant's treating physician and found the ALJ's rejection of the physician based, in part, on two evaluations was legal error. *Id.* Thus, *Ghokassian* teaches that a physician who examines a claimant on a small number of occasions can nonetheless qualify as a treating physician based on the totality of the nature of their relationship. *See generally Rhoades v. Barnhardt*, 64 F. App'x. 76, 79 (9th Cir. 2003).

Here, the ALJ unduly focused on the low number of visits before March 2012 to assign little weight to Dr. Beizai's opinions in the March 2012 questionnaire. *Accord Simmons v. Berryhill*, No. 16CV2612-EFB, 2018 U.S. Dist. LEXIS 47662, at *9 (E.D. Cal. Mar. 21, 2018) ("[T]he ALJ appears to have placed undue weight on the fact that plaintiff saw Dr. Sciolla only three times. The fact that Dr. Sciolla treated plaintiff on only three occasions was a factor which the ALJ could consider, but is not by itself a specific and legitimate reason to assign less weight to the treating physician's opinion."); *see also Johnson v. Berryhill*, No. 16CV2134-EFB, 2018 U.S. Dist. LEXIS 43661, at *13-14 (E.D. Cal. Mar. 15, 2018) ([While i]t is true that an ALJ may consider the length of a treatment relationship in determining what weight to afford a physician's opinion . . . , the Ninth Circuit has held that there is no floor for the number of visits necessary to create a treatment relationship.") (citing *Ghokassian*); *Durham v. Colvin*, No. CV15-567-RAO, 2015 U.S. Dist. LEXIS 170389, at *17 (C.D. Cal. Dec. 21, 2015) (while "the regulations permit an ALJ to consider the length and frequency of the treatment relationship," this is only "one . . . factor" and "is not alone a specific and legitimate reason to give [a treating physician's] opinions less weight.").[6] While it is true that Dr. Beizai saw Plaintiff twice before she penned the March 6, 2012 Mental Impairment Questionnaire, the nature of their relationship—especially given the frequent office visits after March 2012—demonstrates Dr. Beizai was Plaintiff's treating physician.

The Record contains multiple indicia of Dr. Beizai's established treatment relationship with Plaintiff such that she could provide a reliable longitudinal perspective. During the course of the two visits that spanned a combined 80 minutes, Dr. Beizai obtained an extensive history of Plaintiff's past mental health condition. She used that history along with her personal "clinician observations" of Plaintiff to diagnose Plaintiff

---

[6] Because this Court concludes that the ALJ's second basis for discounting Dr. Beizai's opinion was also erroneous, Defendant could not rely on the first reason the ALJ provided even if it was valid.

with depressive disorder with a history of major depressive disorder. (AR 2344, 2359.) As far as prescription of drugs, Dr. Beizai instructed Plaintiff to resume taking 20 milligrams of Prozac at the first visit, (AR 2359), and she later increased the prescription to 40 milligrams per day, (AR 2344). At the first visit, she also instructed him to continue taking Trazadone. (AR 2359.) Finally, Dr. Beizai identified herself as Plaintiff's "Principal Mental Health Provider" on March 6, 2012. (AR 2346.)[7] Thus, as in *Ghokassian*, the Court should find that the ALJ committed legal error in focusing on the small number of office visits without considering the overall nature of Dr. Beizai's treatment relationship with Plaintiff. *Accord Weber v. Comm'r of SSA*, No. CV-16-1565-PHX-BSB, 2017 U.S. Dist. LEXIS 125234, at *20-21 (D. Ariz. Aug. 7, 2017) (considering other factors that evidenced treatment relationship and rejecting ALJ's assignment of "little weight" to treating physician's opinion).

Defendant contends the ALJ did not reject Dr. Beizai's opinions outright but instead "[a]fter carefully considering the evidence, the ALJ settled in the middle ground, finding Plaintiff more limited than Drs. Beizai, Loomis, and Paxton opined in some areas and less limited in others."[8] (Doc. No. 15 at 4.) If the ALJ indeed resolved the conflicting opinions in this manner, he did not resolve a conflict between medical opinions—choosing one over the other—but rather supplanted his own assessment in place of the physicians'

---

[7] The Record confirms their relationship. Dr. Beizai's treatment relationship with Plaintiff continued after this date, as she saw him an additional 9 times between March 2012 and August 2014. (AR 2315 (May 8, 2012); 2266 (October 3, 2012); 2215 (January 8, 2013); 1155 (April 5, 2013); 1145 (July 8, 2013); 1978 (October 8, 2013); 1848 (January 10, 2014); 1785 (April 14, 2014); and 1755 (June 9, 2014).) The Record thus shows that Dr. Beizai saw Plaintiff approximately every three months for a total of 11 examinations over two years. Dr. Beizai's treatment records subsequent to the March 2012 questionnaire do not contradict her initial opinions.

[8] As an initial matter, it is unclear where in his written decision the ALJ explicitly resolved the different opinions in this manner, but on page 701 of the Record, the ALJ grants the opinions of Drs. Loomis and Paxton great weight.

17-CV-2371-W(WVG)

opinions. *See Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . and he must not succumb to the temptation to play doctor and make [his] own independent medical findings. Rather, the ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician.") (internal quotation marks, alterations, and citations omitted). If the ALJ came to a "middle ground" between Dr. Beizai's opinion and Drs. Loomis and Paxton's opinions, he necessarily made a determination that was not supported by any of these doctors' findings, which the Commissioner contends were at opposite ends of the spectrum. As a result, the ALJ erroneously substituted his own opinion for the opinions of physicians if he indeed proceeded as the Commissioner contends. *Accord Sanchez v. Berryhill*, No. SA-CV-17-1347-PLA, 2018 U.S. Dist. LEXIS 151390, at *20-21 (C.D. Cal. Sep. 5, 2018).

In sum, the ALJ erred when he discounted Dr. Beizai's treating opinion based on the number of times she examined Plaintiff.

## 2. The ALJ Erred in Finding that Dr. Beizai's Opinions Were Based Solely on Plaintiff's Chronic Pain

The second reason the ALJ cited for assigning Dr. Beizai's opinion little weight was "that most of the limitations [Dr. Beizai] assessed were reported to be the result of the claimant's pain condition and not due to any mental impairment." (AR 695.) In that same vein, ALJ stated:

> [I]n the March 16, 2012, mental impairment questionnaire, psychiatrist, Dr. Beizai, reported that the claimant could be anticipated to be absent from work more than three times per month as a result of his impairment or for treatment; however, the doctor stated that these absences were more related to his pain condition and not due to any mental impairment. Therefore, the psychiatrist indicated that the claimant would not likely miss work due to any mental impairment.

(AR 700.) Plaintiff challenges this reasoning, contending that his physical pain "does not negate the presence of a mental impairment such as depression." (Doc. No. 14 at 7.) Rather,

he argues, Dr. Beizai's reference to chronic pain was meant only to show that pain exacerbated his mental impairment. (*Id.*) Defendant contends the ALJ provided specific and legitimate reasons because the medical evidence did not corroborate functional limitations beyond Plaintiff's RFC. (Doc. 15-1 at 4-8.) Plaintiff is correct. Dr. Beizai diagnosed Plaintiff with depression and her treatment notes do not contradict this finding. Rather than view Dr. Beizai's treatment record as a whole, the ALJ isolated and focused on portions of the March 2012 assessment questionnaire and mischaracterized Dr. Beizai's findings. As a result, the ALJ's reasoning here is not supported by the Record and is accordingly not a legitimate reason for discounting Dr. Beizai's opinions.

The most glaring problem with the ALJ's finding is his conclusions that Dr. Beizai's opinions were based solely on Plaintiff's pain and were "not due to *any* mental impairment." (AR 695 (emphasis added).) The ALJ's conclusion that Dr. Beizai "indicated that the claimant would not likely miss work due to any mental impairment" was simply not accurate. To the contrary, Dr. Beizai opined Plaintiff suffered from major depressive disorder in her mental health questionnaire on March 6, 2012. (AR 1119-23.) She identified symptoms that included sleep and mood disturbance, emotional lability, decreased energy, difficulty thinking or concentrating, and hostility and irritability. (*Id.* at 1121.) Dr. Beizai noted that Plaintiff's mental impairment manifested itself as depression, irritability, poor sleep, and impaired concentration. (*Id.*) She also noted that Plaintiff's mental health condition exacerbates the experience of his chronic pain. (*Id.* at 1122.) These findings are not inconsistent with major depressive disorder.

It is true that Dr. Beizai qualified her opinion that Plaintiff would miss work more than three times per month was "*more* related to pain condition," (*id.* (emphasis added)), and opined Plaintiff would have difficulty working at a regular job on a sustained basis "*mainly* related to pain," (*id.* at 1123 (emphasis added)). However, these statements did not *exclude* all mental impairments. Accordingly, the ALJ's characterization that the March 2012 limitations Dr. Beizai "assessed were reported to be *the result of* the claimant's pain condition *and not due to any mental impairment*," (AR 695) was not accurate and was not

supported by the Record. Nor was his finding that Dr. Beizai "indicated that the claimant would not likely miss work due to any mental impairment" accurate. (AR 700.) As Plaintiff correctly contends, these statements are factually untrue. Dr. Beizai did not find—as the ALJ stated—that Plaintiff would was not likely to miss work as a result of his mental impairments. Rather, she opined that his chronic pain was a comparatively greater contributor to him missing work.[9] (AR 1122 ("*more* related to pain condition") (emphasis added); 1123 ("*mainly* related to pain").) Rather than ruling out mental impairments, it was implicit in Dr. Beizai's opinions that the mental conditions she had identified elsewhere in the questionnaire would contribute to Plaintiff missing work or his work performance, but Plaintiff's chronic pain was a greater cause. Because the ALJ mischaracterized Dr. Beizai's findings, this reason for discounting her opinions was not supported by the Record.

### 3. Summary

Based on the foregoing, the two reasons the ALJ provided for discounting Dr. Beizai's opinions were not supported by the Record. The ALJ accordingly erred in discounting Dr. Beizai's treating opinions based on these reasons.

## C. The ALJ's Treatment of Dr. Frey's Medical Opinion.

The ALJ recognized Dr. Frey as Plaintiff's "treating internist" but ultimately assigned "minimal weight" to his opinion. The ALJ did so on grounds (1) that Dr. Frey only cited lumbago as the basis for the disability rather than degenerative disc disease or herniation, (2) that Dr. Frey only saw Plaintiff every three months despite the "pretty significant limitations" provided in the physical residual functional capacity questionnaire, and (3) the number of unscheduled breaks Plaintiff would need were consistent with a

---

[9] The Commissioner appears to agree with the Court's interpretation when she contends that "Contrary to Plaintiff's assertion, the fact Dr. Beizai, a psychiatrist, asserted Plaintiff would miss more than four days of work a month *largely due to physical pain* was a proper factor to consider." (Doc. No. 15-1 at 7 (emphasis added).) However, the ALJ did not characterize Dr. Beizai's opinion in this manner. Had he done so, he would have accurately summarized the Record. Instead, he read Dr. Beizai's opinion as excluding any mental impairment and being based solely on Plaintiff's chronic pain.

regular work day. (AR 698-99.) Plaintiff argues that these reasons are not supported by the Record. The Court addresses each in turn and concludes that only the first stated reason is supported by the Record.

**1. Dr. Frey's Lumbago Diagnosis Did Not Include More Severe Ailments**

The ALJ correctly found that Dr. Frey only diagnosed Plaintiff with "lumbago" but "not something more severe like degenerative disc disease or heriations." (AR 698.) However, Plaintiff contends an MRI showed "[p]ositive findings" of "neural foraminal narrowing," which Plaintiff contends is "capable of causing significant pain." (Doc. No. 14-1 at 10 & n3.)

According to the *Encyclopedia Britannica*,

[L]umbago is considered by health professionals to be an antiquated term that designates nothing more than lower back pain caused by any of a number of underlying conditions. The pain may be mild or severe, acute or chronic, confined to the lower back or radiating into the buttocks and upper thighs. It may be caused by a weak or strained back muscle, torn ligaments, a herniated disk, compression of the sciatic nerve (sciatica), degenerative disease of the vertebrae (spondylosis), curvature of the spine (scoliosis), or loss of bone mass (osteoporosis). Mild lower back pain caused by overexertion can be treated with bed rest, application of heat, massage, anti-inflammatory medication, and strength-building exercise. More severe lower back pain is treated by addressing the underlying condition.

http://www.britannica.com/science/lumbago (last visited Dec. 21, 2018); *see also Young v. Aetna Life Ins. Co.*, 146 F. Supp. 3d 313, 318 n.6 (D. Mass. 2015) ("Lumbago is [p]ain in the mid and lower back; *a descriptive term not specifying cause.*") (internal quotations and citation omitted) (emphasis added); *Soto v. Colvin*, 2015 U.S. Dist. LEXIS 49650, at *21 n.19 (S.D.N.Y. Apr. 14, 2015) ("'Lumbago' is a nonmedical term for any pain in the lower back.") (internal quotations and citation omitted). Thus, "lumbago" by itself does not identify the severity of back pain or evidence the existence of an underlying condition. It is simply a generic term for back pain, and the physician can elaborate further to explain the severity of the pain or identify underlying conditions that cause the pain.

17-CV-2371-W(WVG)

Here, the record supports the ALJ's finding that Plaintiff was not diagnosed with an ailment more severe than lumbago. Dr. Frey generally assessed Plaintiff had lumbago, which he described as "lower back pain with radiation to both legs." (AR 1126.) Dr. Frey's clinical notes also do not evidence a more severe condition than this description.[10] Moreover, Dr. Frey did not assess the severity of the lumbago or identify other related or underlying conditions. Such additional assessments possibly could have elevated the severity of Dr. Frey's assessments. But without more, the record only evidences general lumbago. *Cf. McIntosh v. Berryhill*, No. 17CV5403(ER)(DF), 2018 U.S. Dist. LEXIS 120183, at *15-16 (S.D.N.Y. July 16, 2018) (Plaintiff diagnosed with lumbago in addition to "lumbar facet syndrome and lumbar disc displacement"); *Elliott v. Colvin*, No. 15CV312-AC, 2016 U.S. Dist. LEXIS 40635, at *11 (E.D. Cal. Mar. 28, 2016) (Plaintiff diagnosed with "[l]umbago with signs of disk herniation, positive straight leg raise, limited range of motion and pain with palpation, which is moderate to severe.").

Finally, the only MRI in the Record is from 2011 and shows "[m]ild degenerative changes in the lumbar spine, with a minimal disk bulge at L3-L4 causing mild bilateral neural foramina narrowing and at L4-L5 causing mild right and moderate left neural foramina narrowing." (AR 1836.) These MRI findings are characterized as "mild" and "moderate"—not "severe." As a result, the 2011 MRI does not contradict the ALJ's finding that Dr. Frey's lumbago diagnosis did not include a more severe ailment. Nor do other objective tests contradict the ALJ's findings here. Thus, the ALJ provided a specific and legitimate reason for assigning little weight to Dr. Frey's opinion.

---

[10] Although Dr. Frey referenced "lumbar radiculopathy" in examination notes, that reference predated the MRI and was simply Dr. Frey's "Provisional Diagnosis." (AR 2155.) Presumably, this provisional diagnosis was the reason Dr. Frey then ordered the MRI. Notably, the Record does not show that Dr. Frey confirmed his provisional diagnosis after he viewed the MRI. Nor does the record show that Dr. Frey diagnosed Plaintiff with a severe back ailment after the MRI. Rather, he diagnosed Plaintiff with lumbago—an umbrella term used for general back pain—after he had the benefit of the MRI results.

17-CV-2371-W(WVG)

## 2. Dr. Frey Had a Longitudinal Treatment Relationship With Plaintiff

In his decision, the ALJ found that because Plaintiff only visited Dr. Frey every three to six months, his treatment plan was not consistent "with someone experiencing a disabling level of back pain." (AR 700.) However, this was erroneous given the overall treatment relationship Dr. Frey had with Plaintiff.

Rather than consider the treatment relationship, the ALJ focused on the number of times Dr. Frey examined Plaintiff. However, even two visits over a 14-month period can establish a sufficient treatment relationship if other factors are present. *See, e.g.*, *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994). As explained above, the circumstances of the relationship between the claimant and doctor are a more appropriate focus than simply the number of office visits. Here, Dr. Frey personally saw Plaintiff on five occasions and was listed as Plaintiff's primary care provider on a physical therapy referral (AR 2332-34, 2363, 2370-72, 2377-79, 2382, 2408.) Dr. Frey prescribed and altered Plaintiff's medication (AR 2334, 2365, 2410), ordered additional testing (*id.*), and referred him to other medical professions for physical therapy (AR 2370). Plaintiff also went to Dr. Frey when he had chest pain—something that was not related to his continuing back and leg pain. (AR 2365). Dr. Frey's overall treatment notes demonstrate that he not only treated Plaintiff on the days he saw him, but also show that Dr. Frey anticipated continuing to care for Plaintiff and had developed a treatment plan with that continued relationship in mind.

To the extent the ALJ concluded Plaintiff should have visited Dr. Frey more frequently if his pain was really disabling, such a finding that focuses on the number or frequency of visits and ignores the total course of treatment would also be in error. That is because "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated, *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017), which necessarily requires an assessment of the Plaintiff's specific underlying condition. The ALJ did not do so and instead focused on the frequency of Dr. Frey's examination of

Plaintiff. However, Plaintiff continued to see Dr. Frey, underwent physical therapy, and was continuously on medication.

Defendant cites *Senko* and *Rollins* to support the ALJ's findings that a truly disabling impairment requires a higher level of treatment. *Rollins* does not support Defendant's contention, as one of the flaws in the doctor's opinion in that case was its irreconcilable inconsistency with that doctor's own prior findings. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Additionally, the Ninth Circuit credited the ALJ's explanation "that some of Dr. Young's recommendations *were so extreme as to be implausible* and were not supported by *any* findings made by any doctor, including Dr. Young [herself]." *Id.* (emphasis added). *Senko* is likewise distinguishable, as the ALJ in that case properly rejected the opinion of a doctor who cursorily saw the Plaintiff for medication refills. *Senko v. Astrue*, 279 F. App'x. 509, 511 (9th Cir. 2008). Here, Plaintiff did not visit Dr. Frey simply as a formality on his way to obtaining medication refills.

Based on the foregoing, the ALJ erred when he discounted Dr. Frey's opinions based in part upon the frequency of Plaintiff's visits to Dr. Frey.

### 3.  The ALJ Misinterpreted Dr. Frey's Opinion on Unscheduled Breaks

Finally, the ALJ found that Dr. Frey opined Plaintiff "would only need to take unscheduled breaks every four hours and [each break] would have to last 15 minutes . . . [and that t]his fits within the typical two 15 minute breaks and one 30 minute lunch in a typical workday." (AR 699.) Plaintiff argues that the ALJ misread Dr. Frey's response to the questionnaire, which actually "indicated that Ward would need four unscheduled breaks, not an unscheduled break every four hours." (Doc. No. 14-1 at 10.) As a result, Plaintiff argues, "[t]he ALJ observed 'inconsistencies' that actually do not exist." (*Id.*) Defendant responds that "[a] regular eight-hour workday would allot four breaks and there is no indication Plaintiff would be required to schedule such breaks at any particular times throughout the day." (Doc. No. 15-1 at 10.) In reviewing the following response by Dr. Frey, it appears Plaintiff is correct:

f. Will your patient sometimes need to take unscheduled breaks during an 8-hour working day?     (Yes)  No

If yes, (1) how often do you think this will happen? ___4___
       (2) how long (on average) will your patient have to rest before returning to work? ___15 minutes___

(AR 1128-29.) Although the number "4" is not followed by any notation that indicates whether Plaintiff would need four unscheduled breaks per day or whether he would need a break every four hours, logic dictates that the former is correct.

As an initial matter, the Court notes that the main call of the question to Dr. Frey asked about *unscheduled* breaks. Additionally, the specific sub-part to which Dr. Frey responded asked "how often" Plaintiff would need to take an unscheduled break. Although a plausible answer to this question could be "every four hours," such a response would not make sense in the context of an eight-hour workday. For example, if a person hypothetically began work at 8 a.m. under the ALJ's interpretation, his first "unscheduled" break would transpire at 12:00 p.m. However, this is the time many people take *scheduled* lunch breaks. Assuming the lunch break lasts one hour and the employee resumes work at 1:00 p.m., his next break would be at 5:00 p.m., which coincides with the end of his workday. Under the ALJ's interpretation where Plaintiff would receive a break every four hours, Plaintiff would actually receive one break, which he would have received anyway since the break would coincide with his lunch break. Thus, Plaintiff would not receive any *unscheduled* breaks at all.

With the call of the question in mind and in the context of an eight-hour workday, the only plausible interpretation of Dr. Frey's "4" notation is that Plaintiff will require a 15-minute *unscheduled* break *four times per day*.[11] Accordingly, Plaintiff is correct that the

---

[11] Defendant appears to tacitly acknowledge this. Rather than argue in support of the ALJ's reading of Dr. Frey's opinion, she argues that a regular workday could accommodate four unscheduled breaks a day.

17-CV-2371-W(WVG)

ALJ misinterpreted Dr. Frey's opinion and used that incorrect interpretation to conclude that Plaintiff could take his breaks within the confines of an eight-hour workday.

Although Defendant contends that "[a] regular eight-hour workday would allot four breaks and there is no indication Plaintiff would be required to schedule such breaks at any particular times throughout the day," (Doc. No. 15-1 at 10), this is pure argument without support in the Record. Defendant has not identified anything in the Record that indicates what a "regular eight-hour workday" would entail or that would support Defendant's argument that Plaintiff's break requirements could be accommodated. In any event, because the ALJ did not himself advance this reasoning in his decision, this Court cannot affirm his decision based on a ground that he did not advance in the written decision. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (citations and internal quotation marks omitted).

In sum, the ALJ incorrectly concluded that an eight-hour workday could accommodate the number of unscheduled breaks Plaintiff would need. That conclusion was based on an incorrect reading of Dr. Frey's opinion that Plaintiff would need four unscheduled breaks in an eight-hour workday. Accordingly, the Record does not support the ALJ's conclusion that Plaintiff could work a regular day based on the break limitations Dr. Frey identified.

### 4. Summary

The ALJ erred when he discounted Dr. Frey's opinions based on the frequency of his examination of Plaintiff. The ALJ also erred in concluding that a normal workday could accommodate the number of unscheduled breaks Dr. Frey opined Plaintiff would need. However, the ALJ did not err in discounting Dr. Frey's opinions based on the lack a diagnosis more serious than lumbago. This conclusion was accurate and was supported by the Record. Because the ALJ provided one specific and legitimate reason for discounting Dr. Frey's opinion, he ultimately did not err in discounting Dr. Frey's opinions. *Accord Brendan J. G. v. Comm'r, SSA*, No. 17CV742-SI, 2018 U.S. Dist. LEXIS 102891, at *30 (D. Or. June 20, 2018) (upholding ALJ's discounting of opinion where at least one valid

reason was given); *Midlam v. Berryhill*, No. C17-5650 JCC, 2018 U.S. Dist. LEXIS 98565, at *12 (W.D. Wash. June 12, 2018) (same); *Walker v. Berryhill*, No. 17CV5579-TLF, 2018 U.S. Dist. LEXIS 91213, at *12 (W.D. Wash. May 30, 2018) ("Because the ALJ provided at least one specific and legitimate reason, supported by substantial evidence, for giving little weight to Dr. Lewis' opinion, any other improper reason the ALJ may have given to reject that opinion was harmless."); *Jackson v. Colvin*, No. 14-9935, 2016 U.S. Dist. LEXIS 44940, at *12 (C.D. Cal. Mar. 31, 2016) ("The ALJ needed only one specific and legitimate reason to reject the opinion of an examining physician, and he gave one here . . . .").

**D. Harmless Error**

Having found that the ALJ erred, the Court must now consider whether the ALJ's errors are harmless. Error is harmless "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion," *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006), or where it is "clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007); *see also Batson v. Comm'r*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion). Moreover, "a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1055-56.

Here, the Commissioner does not argue that any error was not harmless. Instead, she solely contends there was no error in the first place. She contends that if the Court finds the ALJ erred, "the proper remedy is to remand to the agency for further administrative proceedings, not the payment of benefits . . . ." (Doc. No. 15-1 at 10.) The Court agrees that remand for further proceedings is the appropriate path here. The ALJ discounted Dr. Beizai's opinions for reasons that the Court has found were not supported by the Record. Should the doctor's opinions receive greater treatment by the Commissioner, a finding of

disability may be appropriate. Indeed, the VE's testimony precluded Plaintiff from working his past relevant work if Plaintiff had the social limitations identified in Dr. Beizai's opinion. (AR 737-40.)

Moreover, even if on remand the ALJ concludes that Plaintiff cannot perform his past relevant work, Plaintiff may nonetheless be denied benefits if he can perform other work available in significant numbers in the national economy at step 5 of the disability determination. 20 C.F.R. § 404.1520(g). Because the ALJ found that Plaintiff could perform his past relevant work at step 4, he was not required to make a step 5 finding and did not do so. As a result, remand would be appropriate to allow the Commissioner to consider step 5, if necessary.

In sum, based on the combined factors above, the Court does not conclude that the ALJ's errors were harmless.

**E.     Remand for Further Proceedings**

Plaintiff contends that this matter should be remanded for immediate payment of benefits rather than further proceedings. A remand for further proceedings is unnecessary if the record is fully developed, and it is clear from the record that the ALJ would be required to award benefits. *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001). The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000). Under the law of this Circuit, the Court must "direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed." *Varney v. Sec'y of HHS*, 859 F.2d 1396, 1399 (9th Cir. 1988) (citations omitted).

As explained above, even if the ALJ fully credits Dr. Beizai and finds Plaintiff cannot perform his past relevant work at step 4 of the analysis, he could still deny benefits at step 5. As a result, the Court cannot conclude that remand for further proceedings would serve no useful purpose.

**F.     Disposition of Defendant's Summary Judgment Motion**

Based on the foregoing recommendations that Plaintiff's MSJ be granted-in-part and this matter be remanded for further proceedings, this Court necessarily recommends that Defendant's Cross-MSJ be GRANTED-IN-PART and DENIED-IN-PART.

## VI.     CONCLUSION

This Court RECOMMENDS that Plaintiff's MSJ be GRANTED-IN-PART and DENIED-IN-PART, that Defendant's Cross-MSJ be GRANTED-IN-PART and DENIED-IN-PART, and that the matter be REMANDED for further proceedings.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

**IT IS ORDERED** that **no later than January 25, 2019**, any party to this action may file written objection with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within the specific time may waive to raise those objections on the appeal.

IT IS SO ORDERED.

DATED: January 9, 2019

Hon. William V. Gallo
United States Magistrate Judge